S01A1217, S01A1218. MOSS v. THE STATE (two cases).
(561 SE2d 382)

SEARS, Presiding Justice.

Dwayne Moss and Scott Moss, the appellants in these two cases, were jointly indicted and tried for the malice murder and felony murder of Zannie Mae Dunn and for the burglary of Dunn's apartment. Dwayne pled guilty to theft by receiving stolen property as a lesser included offense of the burglary charge, and was convicted of the felony murder of Dunn. The trial court sentenced Dwayne as a recidivist under OCGA § 17-10-7, and imposed a sentence of life without parole. Scott Moss was convicted of malice murder, felony murder, burglary, and a controlled substance violation. As a recidivist, Scott received three consecutive sentences — life without parole for malice murder, twenty years in prison for burglary, and thirty years in prison for the controlled substance offense.[1] On appeal, Dwayne and Scott raise numerous issues. For the reasons that follow, we conclude

---

[1] The burglary of Dunn's apartment occurred on July 31, 1997, and the murder occurred on or around November 12, 1997. A jury found Dwayne and Scott guilty on September 28, 1999, and the trial court sentenced Dwayne and Scott that same day. Dwayne's trial counsel filed a motion for new trial on October 7, 1999, and the court reporter certified the trial transcripts on various dates, beginning on October 6, 1999, and ending on December 23, 1999. After filing his initial motion for new trial, Dwayne was appointed new appellate counsel, and Dwayne filed an amended motion for new trial on July 17, 2000. The trial court denied Dwayne's motion for new trial, as amended, on October 26, 2000. Dwayne filed a notice of appeal on November 22, 2000, and the appeal was docketed in this Court on May 14, 2001. Dwayne's appeal was submitted for decision on briefs on July 9, 2001. Scott's trial counsel filed a motion for new trial on October 26, 1999. Scott thereafter was appointed new counsel for appeal, and Scott filed an amended motion for new trial on July 17, 2000. The trial court denied Scott's motion for new trial, as amended, on October 26, 2000, and Scott filed a notice of appeal on November 27, 2000. Scott's appeal was docketed in this Court on May 14, 2001, and was orally argued on September 18, 2001.

that all but one are without merit and that, as for that one issue, Dwayne and Scott are procedurally barred from raising it. Accordingly, we affirm Dwayne's and Scott's convictions.

1. Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence would have authorized a rational trier of fact to find beyond a reasonable doubt that Scott Moss lived directly below the victim's apartment; that Scott and Dwayne Moss burglarized the victim's apartment on July 31, 1997, in order to obtain items to pawn so that they could obtain money to purchase crack cocaine; and that on November 12, 1997, Scott and Dwayne Moss killed the victim. We conclude that the evidence is sufficient to support Dwayne's conviction of felony murder and Scott's convictions of malice murder, burglary, and possession of cocaine.

2. Dwayne contends that the trial court erred in denying his motion to sever his trial from that of his brother.

Dwayne had the " 'burden of making a clear showing of prejudice and a denial of due process in the absence of severance.' "[2] In determining whether to grant a severance, a trial court should consider

> whether the number of defendants will create confusion of the evidence and the law applicable to each individual defendant, whether there is a danger that evidence admissible against one defendant will be considered against another despite the cautionary instructions of the court, and whether the defenses of the defendants are antagonistic to each other or each other's rights.[3]

The trial court has discretion in determining whether a severance is necessary and that determination will not be set aside unless there is an abuse of that discretion.[4]

Dwayne contends that his trial should have been severed from Scott's trial because there was a danger that the jury would consider Scott's statement to the police on November 25, 1997, against Dwayne despite the trial court's cautionary instruction not to do so. In that statement, Scott, who did not testify, stated that on November 12, 1997, Dwayne came to Scott's apartment about 7:30 to 8:00 p.m., and that Dwayne went in Scott's bathroom and stayed there for a while. Dwayne contends that the introduction of Scott's statement violated *Bruton v. United States*[5] and required the severance of his

---

[2] *Butler v. State*, 270 Ga. 441, 446 (4) (511 SE2d 180) (1999).

[3] *Butler*, 270 Ga. at 446.

[4] *Heard v. State*, 274 Ga. 196, 199 (552 SE2d 818) (2001); *Gee v. State*, 261 Ga. 178, 179 (3) (402 SE2d 719) (1991).

[5] 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968).

trial. We disagree.

Under the Confrontation Clause of the Sixth Amendment, a criminal defendant has the right to confront witnesses against him and to cross-examine them.[6] Generally, when a jury is instructed that certain testimony or evidence may only be considered against a co-defendant, the jury is presumed to follow the court's instruction and the testimony or evidence is not "considered to be . . . 'against' [the] defendant."[7] In *Bruton*, however, the Supreme Court "recognized a narrow exception to this principle,"[8] by holding that when a facially, "powerfully incriminating" statement of a non-testifying co-defendant is presented to the jury, the risk is so great the jury will ignore the limiting instruction and consider the co-defendant's confession against the defendant that the general rule cannot be followed.[9] The Court thus held that the introduction of such statements, even with a limiting instruction, violates the defendant's right of confrontation.[10]

In contrast to cases involving "powerfully incriminating" statements of a co-defendant, the Supreme Court in *Richardson* stated that when a co-defendant's statement does not directly incriminate the defendant and the jury is required to draw inferences to connect the statement to the defendant, "it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence."[11]

In accordance with the latter principle, this Court and others have held that *Bruton* only excludes statements by a non-testifying co-defendant that directly inculpate the defendant, and that *Bruton* is not violated if a co-defendant's statement does not incriminate the defendant on its face and only becomes incriminating when linked with other evidence introduced at trial.[12] For example, in *Thomas v. State*, Thomas's co-defendant gave a statement in which he told the police that Thomas had bought a 9-millimeter gun that police found in the car in which Thomas and his co-defendant were riding at the time of their arrest on a charge unrelated to the murder prosecution. Forensic tests later showed that the 9-millimeter gun was the murder weapon. We held that because the co-defendant's statement,

---

[6] See *Richardson v. Marsh*, 481 U. S. 200, 208 (107 SC 1702, 95 LE2d 176) (1987); *United States v. Taylor*, 186 F3d 1332, 1335-1336 (11th Cir. 1999).

[7] *Richardson*, 481 U. S. at 206.

[8] *Richardson*, 481 U. S. at 207.

[9] *Richardson*, 481 U. S. at 207; *Bruton*, 391 U. S. at 135-136.

[10] *Richardson*, 481 U. S. at 207; *Bruton*, 391 U. S. at 135-136.

[11] *Richardson*, 481 U. S. at 208.

[12] *Thomas v. State*, 268 Ga. 135, 137-138 (485 SE2d 783) (1997); *Owen v. State*, 266 Ga. 312, 314 (467 SE2d 325) (1996); *Wilkins v. State*, 266 Ga. 278, 279 (466 SE2d 592) (1996); *United States v. Angwin*, 271 F3d 786, 796-797 (9th Cir. 2001); *United States v. Taylor*, 186 F3d at 1335-1336; *United States v. Arias*, 984 F2d 1139, 1142 (11th Cir. 1993).

"standing alone, did not clearly inculpate Thomas, . . . there is no *Bruton* error."[13]

Similarly, in the present case, Scott Moss's statement that Dwayne came to his apartment about 7:30 to 8:00 p.m. on the night of November 12 and stayed in his bathroom for a while does not, standing alone, clearly incriminate Dwayne Moss. It only became incriminating when linked with other evidence introduced at trial. Accordingly, we conclude that the introduction of Scott's statement did not violate *Bruton*.

Dwayne also contends that he and Scott had antagonistic defenses and that the trial court should have severed the brothers' trials for that reason. However, "[t]he mere fact that codefendants' defenses are antagonistic is not sufficient in itself to warrant the grant of a separate trial absent a showing of harm."[14] "The burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing of prejudice and a consequent denial of due process."[15] In the present case, we conclude that Dwayne did not make a clear showing that any antagonism between Scott and himself was harmful to Dwayne and amounted to a denial of due process.

Accordingly, we conclude that the trial court did not abuse its discretion in denying Dwayne's motion to sever.

3. Contrary to Dwayne's and Scott's contentions, we conclude that the trial court did not err in permitting the State to introduce evidence of their cocaine use, as that evidence was relevant to prove the motive for the crimes committed.[16]

4. We conclude that the trial court properly permitted the State to introduce evidence concerning Dwayne's plea of guilty to theft by receiving stolen property stemming from the July 31, 1997, burglary of the victim's apartment, as the evidence of the prior crime was admissible as a similar transaction.[17]

5. Dwayne and Scott contend that the trial court erred in permitting a police officer to testify that, in his experience, people who use cocaine "tend to pawn and burglarize and steal to support their habit" and become physically "stimulated." At trial, Dwayne and Scott objected to the testimony that cocaine users tended to "pawn and burglarize" on that ground that the testimony was "speculative,"

---

[13] *Thomas*, 268 Ga. at 138. Accord *Owen*, 266 Ga. at 314 (a co-defendant's statement, standing alone, must clearly incriminate the defendant for there to be a *Bruton* violation).

[14] *Holmes v. State*, 272 Ga. 517, 518 (529 SE2d 879) (2000).

[15] *Dennard v. State*, 263 Ga. 453, 455 (435 SE2d 26) (1993).

[16] See *Adams v. State*, 272 Ga. 115, 117 (527 SE2d 200) (2000); *Holcomb v. State*, 268 Ga. 100, 104 (485 SE2d 192) (1997).

[17] See *Felder v. State*, 273 Ga. 844, 845-846 (545 SE2d 918) (2001).

and they objected to the testimony that cocaine users become "stimulated" on the ground that the testimony was beyond the knowledge of the testifying officer. On appeal, however, Dwayne and Scott contend that such evidence improperly placed their character into evidence and did not meet the requirements for introducing evidence of habit or routine. Because Dwayne and Scott did not raise at trial the objections they now raise on appeal, we conclude that they are procedurally barred from raising these objections on appeal.[18] Finally, we also conclude that even if the trial court erred in permitting the testimony in question, the error was harmless.[19]

6. The trial court did not err in permitting an employee of the Georgia Bureau of Investigation to testify that a hair found on the victim matched a hair sample from Dwayne Moss.[20] Contrary to Dwayne's contention, "hair comparison evidence is not novel and has been widely accepted in Georgia courts."[21]

7. Dwayne and Scott contend that the trial court erred in failing to grant a mistrial after it was learned during the trial that the State had taken hair samples from a close friend of the victim, but had not tested them before trial. However, because, as Dwayne and Scott conceded at trial, it would not have been surprising to find a hair of the victim's close friend on her clothing, because it was disclosed during trial that the victim's friend had given a hair sample, and because the trial court offered to have a state's expert test the hair sample to determine if there was a match, which offer Dwayne and Scott declined, we conclude that the trial court did not err in denying Dwayne's and Scott's motion for a mistrial.[22]

Moreover, we disagree with Dwayne's and Scott's contention that the trial court should have granted them a continuance on its own motion in order to permit them to conduct their own independent testing on the material. In this regard, Dwayne and Scott contend that the State failed to comply with the applicable discovery statutes, see OCGA §§ 17-16-1 to 17-16-10, and that, to cure this failure, the trial court should have granted them a continuance under § 17-16-6. Assuming that the State failed to comply with the applicable discovery statutes,[23] Dwayne's and Scott's failure to "request a continuance

---

[18] *Roseberry v. State*, 274 Ga. 301, 303-304 (553 SE2d 589) (2001).

[19] See *Thomas v. State*, 274 Ga. 156, 163 (8) (549 SE2d 359) (2001) (any error in admitting hearsay was harmless, as the substance of the hearsay statements "was duplicated by other admissible evidence"; in the present case, there was other admissible evidence discussing the fact that Scott and Dwayne had stolen property and pawned it for money to buy cocaine). See also *Allen v. State*, 272 Ga. 513, 516 (5) (530 SE2d 186) (2000) (error held harmless considering "the strength of the evidence of appellant's guilt").

[20] *Pace v. State*, 271 Ga. 829, 839-840 (524 SE2d 490) (1999).

[21] Id.

[22] See *Knight v. State*, 271 Ga. 557, 559-560 (521 SE2d 819) (1999).

[23] But see OCGA § 17-16-4 (a) (3) and (4), which only require the State to permit the

to cure any prejudice which may have resulted from the State's failure to comply with the requirements of OCGA § 17-16-1 et seq."[24] waived their right to assert error on appeal stemming from the State's alleged failure to comply with discovery statutes.[25]

8. Dwayne contends that the trial court violated his constitutional right to be present at his trial when it held a charge conference without him being present. We disagree with this contention for two reasons. First, the record shows that Dwayne acquiesced to the court holding the charge conference without him being present.[26] Second, we have recently held that because "the charge conference involves essentially legal argument,"[27] it does not violate a defendant's right to be present when he is excluded from such a conference.[28]

9. Dwayne next contends that the trial court erred in charging that a witness may be impeached by a conviction of a crime involving moral turpitude. More specifically, Dwayne contends that the only certified copy of a conviction involving moral turpitude introduced into evidence at trial was his conviction for theft by receiving, and that the jury could only have inferred that he was the person impeached by the introduction of the conviction. We find no merit to this contention.

First, Dwayne was not a witness at the trial, and as jurors are presumed to follow the trial court's instructions,[29] we must presume that the jury would not have applied the impeachment instruction to Dwayne. Second, because jurors are presumed to follow the trial court's instruction, we must presume that they followed the court's instruction in this case to consider the prior crime for the limited purpose for which they were instructed. Third, two witnesses at trial testified on cross-examination by Dwayne that they had been convicted of crimes that involve moral turpitude. Because the State made no best-evidence objection, the witnesses' testimony was sufficient to prove the crime.[30] Thus, the jury could have properly understood the impeachment instruction to apply to these two witnesses

---

defendant to inspect "tangible objects," § 17-16-4 (a) (3), or "scientific tests or experiments," § 17-16-4 (a) (4), that the State intends to use as evidence at trial. Here, the State did not test the victim's friend's hair sample and did not intend to use any evidence regarding the hair sample of the victim's friend because the victim's friend had an alibi that was supported by the testimony of other people and because the State found the victim's blood in Scott's apartment.

[24] *State v. Dickerson*, 273 Ga. 408, 411 (542 SE2d 487) (2001).

[25] Id.

[26] See *Kennedy v. State*, 274 Ga. 396, 397 (554 SE2d 178) (2001).

[27] *Huff v. State*, 274 Ga. 110, 111 (549 SE2d 370) (2001).

[28] Id. at 111-112.

[29] *Holmes v. State*, 273 Ga. 644, 648 (543 SE2d 688) (2001).

[30] *Harwell v. State*, 270 Ga. 765, 770 (512 SE2d 892) (1999); *McIntyre v. State*, 266 Ga. 7, 10 (463 SE2d 476) (1995).

and not to Dwayne. For the foregoing reasons, we find no merit to this contention.

10. Dwayne contends that the trial court erred in giving a charge on bare suspicion. However, because Dwayne requested the charge, he may not complain of it on appeal.[31]

11. We conclude that there is no merit to Dwayne's contention that the trial court erred in sentencing him as a recidivist under OCGA § 17-10-7 or to his contention that the trial court erred in failing to grant a post-trial motion made by Scott to conduct DNA testing.

12. Although Dwayne and Scott both contend they received ineffective assistance of trial counsel, Scott does not specify any alleged errors of trial counsel, and neither Dwayne nor Scott undertakes to show how any error of trial counsel harmed them. Accordingly, we conclude that they have failed to carry their burden of proof to establish that they received ineffective assistance of trial counsel.[32]

13. Scott Moss contends that the trial court erred in ruling that there was sufficient evidence to support a finding of probable cause to issue a warrant on November 24, 1997, to search his apartment. More specifically, Scott contends (1) that the detective who gave the affidavit on which the warrant was issued made material misrepresentations and omissions in the affidavit, and (2) that deleting the material misrepresentations from the affidavit and adding into the affidavit the material omissions lead to the conclusion that the warrant was not supported by probable cause. For the reasons that follow, we find no error.

"Ultimately, this Court's role on review is to 'determine if the magistrate had a "substantial basis" for concluding that probable cause existed to issue the search (warrant).' "[33] Moreover, as the reviewing court, we must "give substantial deference to the magistrate's decision to issue a search warrant after finding probable cause."[34] In addition, if a court determines that an affidavit contains material false representations or omissions, "the false statements [must] be deleted, the omitted truthful material [must] be included, and the affidavit [must] be reexamined to determine whether prob-

---

[31] *Barnes v. State*, 269 Ga. 345, 356 (496 SE2d 674) (1998); *Brown v. State*, 262 Ga. 833, 834 (426 SE2d 559) (1993).

[32] See *Pittman v. State*, 274 Ga. 260, 264 (553 SE2d 616) (2001) ("The burden was on appellant to establish that he received ineffective assistance of counsel (*Van Alstine v. State*, 263 Ga. 1 (426 SE2d 360) (1993)), and he was required to show that counsel performed deficiently and that, but for the deficient performance, there was a reasonable likelihood that the outcome of the trial would have been different.").

[33] *Abraha v. State*, 271 Ga. 309, 311 (518 SE2d 894) (1999), quoting *DeYoung v. State*, 268 Ga. 780, 787 (493 SE2d 157) (1997).

[34] *Abraha*, 271 Ga. at 311.

able cause exists to issue a warrant."[35]

The warrant in question was based upon an affidavit made by a Detective Maloney. As previously stated, Scott contends that Detective Maloney made material misrepresentations and omissions in his affidavit. For example, in the affidavit, Detective Maloney stated that Dwayne Moss had picked up several items, including an Emerson VCR, from Scott's apartment and pawned them. Scott contends that the affidavit omitted to state that Dwayne had a criminal record. The affidavit, however, acknowledged that Dwayne pawned items stolen from Dunn's apartment, and thus implied criminal activity on Dwayne's part in the matter at issue. On balance, we conclude that this omission was not material, and would not have led to a different conclusion regarding probable cause even if it had been included in the affidavit. Without detailing each additional alleged omission or misrepresentation, we conclude that deleting any alleged misrepresentation and including any alleged omission,[36] the affidavit was sufficient to establish probable cause to issue the warrant.[37]

14. Scott Moss contends that the trial court erred when it concluded that, in recovering dried blood from the underside of his sink, law enforcement officers did not exceed the scope of the search permitted by the November 24, 1997, warrant. For the following reasons, we disagree with this contention.

The search warrant in question provided, in relevant part, that officers could search Scott's apartment for "clothing and shoes with possible blood stains." Detective Larry Wood testified that he was present in Scott's apartment on the day of the search. He stated that he was standing in the hallway near Scott's bathroom when he noticed what appeared to be an "off-reddish" color hand print on the frame of the bathroom door. He thought the hand print might be blood, and he walked over to look at it and also looked in the bathroom. When he looked in the bathroom, he saw a bottle of Clorox and a rag, and he thought that they might have been used to clean up any blood stains. He also saw a small red spot on the left side of the sink, and conducted a test to determine if the spot was human blood. The test was positive for human blood. At that point, the detective looked on the underside of the sink for other stains, and saw what appeared to be additional dried blood directly under the stain on the upper part of the sink. He collected some of that dried substance, and DNA testing, evidence of which was introduced at trial, confirmed that it was the blood of the victim.

---

[35] *Redding v. State*, 192 Ga. App. 87, 88 (383 SE2d 640) (1989). Accord *Peters v. State*, 213 Ga. App. 488, 489 (445 SE2d 290) (1994).

[36] See *Redding*, 192 Ga. App. at 88; *Peters*, 213 Ga. App. at 489.

[37] See *Abraha*, 271 Ga. at 311-312.

For the following reasons, we conclude that the search that uncovered the dried blood was "reasonable" under the Fourth Amendment. We turn, first, to the "plain view" doctrine. For evidence to be admissible under that doctrine, the officer collecting the evidence must not have violated the Fourth Amendment in arriving at the place from which he or she sees the evidence.[38] Moreover, the incriminating nature of the object must be " 'immediately apparent.' "[39] This requirement means that the officer must have probable cause "to believe that the item in question is evidence of a crime or is contraband."[40]

In the present case, because the search warrant authorized Detective Wood to search for bloody clothes and shoes, and because a bathroom is a reasonable place to look for such items, it is clear that Detective Wood was acting within the scope of the warrant when he looked in the bathroom and saw, in plain view, the small red spot on the sink. Moreover, we conclude that Detective Wood had probable cause to believe that the stain might be blood and thus evidence of the crime, based on his knowledge of the number of times the victim had been stabbed; the amount of blood that was present at the crime scene; the knowledge that the assailant would have had significant amounts of blood on him and his clothes and shoes; and the knowledge that the victim's assailant might have used a bathroom to wash away the victim's blood.

After finding the red stain on the sink, Detective Wood, knowing that blood might have run down the sides of the sink and onto the underside of the sink, then looked along the sides of the sink and on the underside of the sink, and saw the dried blood under the sink. The issue is whether this aspect of Detective Wood's search unreasonably violated Scott's privacy interests or was reasonable once the detective had probable cause to believe that blood was on the sink.

We conclude that Detective Wood's act of looking under the sink was reasonable under the circumstances of this case. First, a limitation on the "plain view" doctrine is that it "may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges."[41] In this case, Detective Wood did not extend his search from the sink to other objects; he merely viewed the object (the sink) on which he had probable cause to believe he had found evidence of the crime. Thus, upholding Detective Wood's search in this case does not violate this limitation on the "plain view" doctrine.

---

[38] *Horton v. California*, 496 U. S. 128, 136-137 (110 SC 2301, 110 LE2d 112) (1990).
[39] Id. at 136.
[40] *Arizona v. Hicks*, 480 U. S. 321, 323 (107 SC 1149, 94 LE2d 347) (1987).
[41] *Coolidge v. New Hampshire*, 403 U. S. 443, 466 (91 SC 2022, 29 LE2d 564) (1971).

Moreover, the present factual scenario is similar to a factual scenario that the United States Supreme Court discussed with approval in *Arizona v. Hicks*.[42] There, police officers had entered the defendant's apartment to search "for the shooter, for other victims, and for weapons."[43] Once in the apartment, one of the officers saw, in plain view, expensive stereo equipment that "seemed out of place in the squalid and otherwise ill-appointed four-room apartment."[44] The officer moved the stereo equipment in order to observe the serial numbers; phoned in the serial numbers to headquarters; and learned that the stereo equipment had been stolen. The United States Supreme Court held that the officer had engaged in a search unrelated to the primary search itself by moving the stereo equipment to observe the serial numbers.[45] The Court, however, stated that the search involved in moving the stereo equipment would have been reasonable if, pursuant to the "plain view" doctrine, the officer had had probable cause to believe that the stereo equipment was stolen.[46]

Here, Detective Wood had probable cause to believe that evidence related to the crime — blood — was on top of the sink. Moreover, Detective Wood could reasonably conclude that the blood was placed there by someone attempting to wash blood off himself, and because blood could have easily run along the side and the bottom of the sink in the cleaning process, Detective Wood likewise had probable cause to believe that blood could be located in those places. Accordingly, if the search involved in *Hicks* in moving the stereo equipment in order to confirm further evidence of the crime by looking at the serial number would have been reasonable if the officer had had probable cause to believe that the stereo equipment constituted evidence of criminal activity, we conclude that Detective Wood's search in this case was reasonable if he had probable cause to believe that evidence of criminal activity was located on the sink. Because we conclude that Detective Wood had such probable cause, we conclude the search in question was valid.

This conclusion is also supported by the case of *United States v. Menon*.[47] In that case, a warrant authorized the search of the defendant's office and the desk of a secretary for "originals and copies of blank invoices bearing the name of Abad Fisheries." The agent in charge of the search also told the assisting agents to look for any documents regarding a company named Jabeco, a company which the supervising agent knew had been involved in the criminal activity.

---

[42] 480 U. S. at 323-329.
[43] Id. at 323.
[44] Id. at 323.
[45] Id. at 324-325.
[46] Id. at 326-328.
[47] 24 F3d 550, 559-563 (3rd Cir. 1994).

During the search of the secretary's desk, an agent discovered a file marked "Abad Fisheries" and also discovered documents with Jabeco's name on them. She took the Jabeco documents to the supervising agent, and when he glanced at the first document, he noticed, in plain view, the words "Jabeco" and "for reprocessing purposes." Because he knew that the word "reprocessing" was a euphemism for "irradiation" and that "irradiation" was involved in the criminal activity, he read the whole document. The Third Circuit concluded that the agent's reading of the entire document was reasonable, on the ground that he had probable cause to believe that the document was evidence of criminal activity after seeing the word "reprocessing" in plain view.[48]

Similarly, in the present case, once Detective Wood saw what he had probable cause to believe was blood in plain view, he then had probable cause to believe that blood would be located at other parts of the sink, and his search of those parts was reasonable.

For the foregoing reasons, we find no merit to this enumeration of error.

15. Scott next contends that the trial court violated his rights under *Bruton v. United States*[49] when it permitted the State to introduce into evidence pre-trial statements that Dwayne made to the police. However, for the same reasons that the trial court did not err in permitting the State to introduce Scott's statement to the police at trial, the court similarly did not err in permitting the State to introduce Dwayne's statement.[50]

16. Contrary to Scott's contention, and for many of the same reasons we concluded that the trial court did not err in denying Dwayne's motion to sever,[51] we conclude that the trial court did not err in denying Scott's motion to sever his trial from Dwayne's trial.[52]

17. Scott contends that the trial court erred in failing to sever the July 31 burglary offense from the November murder offense. Our review of the record, however, convinces us that the evidence concerning the burglary charge was sufficiently linked to the murder charge so that the trial court did not err in denying the motion to sever the offenses.[53]

18. Because Dwayne Moss was not a witness in this case, he was not subject to impeachment, and the trial court did not err in refus-

---

[48] *Menon*, 24 F3d at 563. The court noted in part that "once an object has come into plain view in the course of a legitimate search, any privacy interest in preventing a cursory inspection of that object has been destroyed." Id. at 562-563.

[49] 391 U. S. 123.

[50] See Division 2, supra.

[51] See Division 2, supra.

[52] See *Butler*, 270 Ga. at 446; *Holmes*, 272 Ga. at 518; *Dennard*, 263 Ga. at 455.

[53] *Camphor v. State*, 272 Ga. 408, 411 (529 SE2d 121) (2000).

ing to permit Scott Moss to impeach him by his previous convictions of crimes involving moral turpitude.[54]

19. For the foregoing reasons, we affirm the convictions of Dwayne and Scott Moss.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 25, 2002 — RECONSIDERATION DENIED APRIL 11, 2002.

*Derek H. Jones*, for appellant (case no. S01A1217).
*Lee W. Fitzpatrick*, for appellant (case no. S01A1218).
*Patrick H. Head, District Attorney, Amy H. McChesney, Ann B. Harris, Dana J. Norman, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Ruth M. Bebko, Assistant Attorney General*, for appellee.

---

[54] See OCGA § 24-9-84 (a "witness" may be impeached by proof of bad character). Moreover, even if Dwayne had testified, in order to impeach Dwayne, Scott would still have to overcome the cases holding that defendant may not be impeached by a previous conviction unless he first puts his character into issue. See *Jones v. State*, 257 Ga. 753, 758 (363 SE2d 529) (1988).